**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KENNETH HUGGINS, Sr.,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **COATESVILLE AREA SCHOOL** | : | |
| **DISTRICT,** *et al.,* | : | |
| *Defendants.* | : | **No. 07-4917** |
| | : | |

---

| | | |
|---|---|---|
| **KENNETH HUGGINS, Sr.,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **COATESVILLE AREA SCHOOL** | : | |
| **DISTRICT,** *et al.,* | : | |
| *Defendants.* | : | **No. 09-1309** |

**M E M O R A N D U M**

PRATTER, J.                                                    OCTOBER 29, 2010

**INTRODUCTION**

Kenneth Huggins, Sr., sued the Coatesville Area School District (the "School District")
and various School District officials and employees, alleging that these parties were responsible
for racial discrimination and retaliation that Mr. Huggins claims to have suffered while serving as
a School District custodian.

Mr. Huggins has presented his claims in the two separate cases captioned above. In his
first Complaint, filed on November 21, 2007, he presented seven claims alleging racial
discrimination. In his second Complaint, filed on March 26, 2009, Mr. Huggins presented six
new claims relating to alleged racial discrimination and retaliation. Most of Mr. Huggins' initial
claims in each of the two complaints have been dismissed, along with several named defendants.

The remaining defendants – the School District and administrators Dr. Marie Walker, Richard Como, and Pedro Quinones – have now filed motions for summary judgment, which would, if granted, dispose of the remainder of the claims in each of Mr. Huggins' two cases.

For reasons discussed below, the Court will grant these Motions in their entirety.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Mr. Huggins, who is African American, has been employed at the Gordon Elementary School ("Gordon"), which is part of the School District. At all relevant times, he has been working as a custodian.

On December 20, 2005, at least one female student who was enrolled in an after-school program at Gordon informed an art teacher, Mr. Hober, and a teacher's aide, Rita Hannum, that she (the student) was "afraid" of Mr. Huggins. Ms. Hannum relayed this information to another teacher named Ellen Berger. According to Dr. Marie Walker, the Gordon principal, Ms. Hannum and Ms. Berger walked into her office on the morning of December 21, 2005, and informed her that three girls had told Mr. Hober and Ms. Hannum that they were afraid of Mr. Huggins. (In her deposition, Ms. Berger confirmed that Dr. Walker did not summon her to discuss the issue.)

Dr. Walker says that she reported the students' concerns to the District's Human Resources ("HR") Department, and that, as a result, the HR director, Kathleen Garman, met with the students who had raised the issue. This meeting took place on December 22, 2005. Dr. Walker attended the meeting, but she claims that she did not volunteer any information, and only

_____

[1] The facts as presented here are based on the depositions of Ellen Berger, Kenneth Huggins, and Marie Walker, and from other documents that are in the record. Any significant discrepancies in the record are noted.

2

listened and asked a few questions.

During the meeting, the students claimed, *inter alia,* that Mr. Huggins looked conspicuously at the rears of certain female teachers; licked his lips at one of the students "like he wanted to do something bad to [her]"; and licked his lips in a "nasty" way while looking at certain "skinny" teachers. One student reported that she was "scared [to] go to the bathroom because [Mr. Huggins] cleans the bathroom," and was scared to walk by him on the way to her locker. She expressed a concern that Mr. Huggins was "going to do something bad."[2]

Following the meeting, Mr. Huggins was placed on ten-day unpaid leave, pending the results of an internal investigation into the students' complaints. In a letter dated January 11, 2005, the HR director, Ms. Garman, told Mr. Huggins that his suspension would be continued indefinitely, pending recommendation to the School Board that he be terminated. Two weeks later, by way of a letter dated January 25, 2006, the School District superintendent, Richard Como, informed Mr. Huggins that the District's administration would be recommending his dismissal to the District's Board of School Directors, on the ground that he had violated portions of the Public School Code relating to inappropriate conduct and sexual harassment.[3]

Ultimately, Mr. Huggins' termination was reversed. In September of 2006, an arbitrator appointed by the American Arbitration Association concluded that the students' testimony was "largely uncorroborated, grossly unreliable, and likely the result of misperceived behavior." The

---

[2]    These statements are taken from a transcript of the minutes of the meeting, included as Exhibit H to Defendants' Motion for Summary Judgment as to the first Complaint (Case No. 07-4917). Mr. Huggins does not contest that these allegations were made, only their basis in fact.

[3]    Both of these letters are attached as exhibits to the Motion for Summary Judgment. They are Exhibits I and J, respectively.

arbitrator determined that the decision to terminate Mr. Huggins was not based on just cause, and

that the School District had failed to meet its burden of proving that termination was justified.[4]

As a result of the arbitrator's ruling, Mr. Huggins was partially reinstated.[5]

Mr. Huggins believes that the School District's stated explanation for its adverse

employment action – namely, that Mr. Huggins had violated the Public School Code – was

pretextual. He offers an alternative theory to explain the School District's behavior, arguing that

the Defendants tried to have him fired because he had – prior to the allegations presented by the

three students – complained to one of Dr. Walker's superiors about three statements that she had

allegedly made to him. These comments, which Mr. Huggins calls "racial slurs," are alleged to

have been the following:

> **1.** According to Mr. Huggins, Dr. Walker once asked Mr. Huggins: "Hey Ken, is that your bomb parked out there in my parking spot?" Notwithstanding the allegation in the Complaint, Mr. Huggins acknowledged in his deposition that although he considered this reference to his car as a "bomb" to be "disrespectful," he did not believe it to be related to his race.
>
> **2.** According to Mr. Huggins, Dr. Walker once told him that she had lived in Africa and in the Carribean, and said: "I know how to deal with black people. ... I know how to put a hold on black people. [I know] how to keep black people in check."
>
> **3.** According to Mr. Huggins, Dr. Walker once called for Mr. Huggins, who was performing his work duties, by saying: "Hey, boy, with the trash bag, come here." Mr. Huggins responded: "Excuse me?" Dr. Walker repeated what she had said: "You heard what I said. 'Hey, boy, with the trash bag, come here.'" According to

---

[4]     The arbitrator's decision is attached as Exhibit H to Mr. Huggins' Response in Opposition to the Motion for Summary Judgment with regard to the first Complaint.

[5]     As discussed *infra*, one element of Mr. Huggins' claim is that he was never fully reinstated to his position at Gordon.

Mr. Huggins, this incident took place around November 15, 2005.[6]

Mr. Huggins says that not long after the third of these incidents, he reported Dr. Walker's alleged remarks to a man he identifies only as Roger Johnson, and also to Dr. H. Major Poteat, who served as the School District's assistant superintendent and Dr. Walker's supervisor. The exact timing of Mr. Huggins' conversation with Dr. Poteat is unclear, but in his deposition, Mr. Huggins seems to imply that he talked to Dr. Poteat very soon after the third alleged comment (which he says was made on November 15, 2005).

In his first Complaint, Mr. Huggins claims that approximately a week after he talked to Dr. Poteat, he had a conversation with Ms. Berger and another woman named Bridget Miles, and that Ms. Berger and Ms. Miles told him that Dr. Walker had "summoned" Ms. Berger to her office in order to "dig up dirt" on Mr. Huggins in retaliation for his reporting her comments.[7] In his deposition, however, Mr. Huggins does not actually say that Ms. Berger informed him that Dr. Walker was attempting to build a foundation for an adverse employment action (or "dig up dirt"); he simply says that Ms. Berger informed him that she had met with Dr. Walker.

After receiving his termination letter in late 2006, but before discovering that his termination was reversed, Mr. Huggins filed a "complaint of grievance" with the Pennsylvania Human Rights Commission (the "PHRC").[8] On November 21, 2007, Mr. Huggins and his wife,

---

[6]     It is not clear from the first Complaint when the two earlier comments are alleged to have been made. The wording of each alleged statement comes from Mr. Huggins' deposition.

[7]     As noted above, Ms. Berger stated in her deposition that Dr. Walker did not, in fact, "summon" her to her office in connection with the girls' sexual harassment allegations.

[8]     This is attached as Exhibit M to the Defendants' Motion for Summary Judgment as to the claims presented in the first Complaint.

Monica Huggins, filed the first Complaint against the School District, Dr. Walker, Mr. Como, and two other School District employees, Frank D'Angelo and Pedro Quinones.[9]   The first Complaint had seven counts.  Counts I, II, IV, and V set forth claims under the Civil Rights Act of 1964, the Pennsylvania Human Relations Act (the "PHRA"), 42 U.S.C. § 1983, and the Equal Protection Clause of the Fourteenth Amendment.  The three other counts were entitled "Malicious Acts," "Intentional Infliction of Emotional Distress," and "Loss of Consortium."

The overarching theory presented in the first Complaint is that Dr. Walker herself directed the sexual harassment investigation, and attempted to have Mr. Huggins fired because she was angry that he had reported her remarks to Dr. Poteat.  Mr. Huggins also claims that even when he was reinstated after the favorable arbitration decision, he was given an undesirable night schedule (as opposed to his previous daytime work schedule), was assigned to a different School District facility, and also "was assigned more duties than white male co-workers."

On August 27, 2008, the Court dismissed the majority of the claims presented in the first Complaint — including all of the claims against Messrs. Como, D'Angelo and Quinones – and dismissed Mrs. Huggins as a plaintiff.  The only remaining claims from the first Complaint are: (1) the Title VII claim against the School District (Count I); (2) the PHRA claim against the School District and Dr. Walker (Count II); and (3) the Section 1983 discrimination claim against Dr. Walker (Count V).  *See Huggins v. Coatesville Area Sch. Dist.*, 2008 U.S. Dist. LEXIS 65604 (E.D. Pa., August 27, 2008).

On March 26, 2009, Mr. Huggins filed an entirely new action (hereinafter, "the second

---

[9]      Mr. Quinones was initially misnamed as "Pedro Quiles," and the second Complaint refers to him as "Pedro Quiones."

Complaint") against the School District, Mr. Como and Mr. Quinones. The second Complaint set forth six counts against all three Defendants. These six counts had the same titles as the first six counts in the first Complaint.[10] The theory of the second Complaint is that these Defendants have, since the filing of the first Complaint, continued to retaliate against Mr. Huggins and have actually initiated a new pattern of retaliatory behavior.

Specifically, Mr. Huggins claims that on September 23, 2008, Mr. Como came to Mr. Huggins and told him that he should not have named him in the first Complaint (Huggins Depo. at 148). He further claims that on the same day, he asked Mr. Como to transfer him back to Gordon, from which he had been removed in the wake of the sexual harassment allegations of 2005, and that Mr. Como responded that he would "get with [i.e., talk to] the fellows" and get back to him. On September 26, Mr. Quinones allegedly delivered Mr. Como's verdict:

> Pedro [Quinones] come over and said to me, he said Mr. Como sent me over and he said, Mr. Como sent me over and about whatever you were asking him, he said the response is he can't do it. He talked to the fellows and he can't do it. But he did say if you were to get rid of the [first] lawsuit, you can go anywhere you want and he smiled when he said it.

Huggins Depo. at 152.

On the basis of this statement, Mr. Huggins proposes that he is being kept from transferring to Gordon as punishment for the filing of his lawsuit. He also says that he has not received any pay increases since the first Complaint was filed, and alleges that Mr. Quinones – whose role within the District is not described in the second Complaint – has falsely accused him of poor performance and subjected him to unusual and unnecessary scrutiny.

On August 20, 2009, the Court dismissed the majority of the claims in the second

---

[10] The seventh, "Loss of Consortium," was not included.

Complaint, leaving: (1) the Title VII claim against the School District (Count I); (2) the PHRA claim against the School District (Count II); and (3) the Section 1983 claim against Mr. Como and Mr. Quinones (Count V). The Court did not issue a full opinion, but based its ruling on the same reasoning that it had previously provided in dismissing analogous claims that were presented in the first Complaint.

The School District and Dr. Walker have filed a Motion for Summary Judgment as to the first Complaint, and the School District, Mr. Como, and Mr. Quinones have filed a Motion for Summary Judgment regarding the second Complaint. In this opinion, the Court addresses the merits of each motion.

LEGAL STANDARDS

Upon the motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). An issue is considered "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is considered "material" only if it could affect the result of the suit under governing law. *Id.*

Evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.

*Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 217, 322 (1986); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record. *Celotex*, 477 U.S. at 322-23. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 642 (E.D. Pa. 2004) (*citing Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

## DISCUSSION

### I.    *Title VII Claims Against the School District*

In each of his two Complaints, Mr. Huggins alleges that the School District has violated Title VII of the Civil Rights Act of 1964, which prohibits, *inter alia*, racial discrimination. The purportedly unlawful statements and actions that form the basis of Mr. Huggins' Title VII claims are (1) certain comments that Mr. Huggins attributes to a School District administrator, Dr. Walker, which Mr. Huggins has described as "racial slurs"; and (2) the allegedly retaliatory actions that the School District took when Mr. Huggins (a) reported these alleged comments and (b) filed the first Complaint. The Court will address each of these Title VII claims in turn.

## A.    *Hostile Work Environment*

In order to make out a successful hostile work environment claim against an employer under Title VII, a plaintiff must demonstrate, "by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (*citing Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)).   Specifically, the plaintiff must show that: (1) he suffered intentional discrimination because of his race; (2) the discrimination was pervasive and regular; (3) the discrimination affected him detrimentally; (4) the discrimination would detrimentally affect a reasonable person of the same race in the same position; and (5) the existence of *respondeat superior* liability.   *Id.*

The Supreme Court has emphasized that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270-271 (2001) (*quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).   Discriminatory conduct must be so "severe and pervasive" that it actually "alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment."   *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998) (citations and internal quotation marks omitted).   The Supreme Court repeatedly has stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."   *Id.* at 788 (citation and internal quotation marks omitted).

Mr. Huggins concedes that Dr. Walker made no more than three comments that he considered to be discriminatory: (1) her reference to Mr. Huggins' car as a "bomb"; (2) her statement that she "knows how to keep black folks in check"; and (3) her addressing of Mr. Huggins as "boy" on one occasion. During his deposition, Mr. Huggins further acknowledged that only two of these three comments were related to his race: although Mr. Huggins found the "bomb" comment to be "disrespectful," he did not consider it to be racially motivated.[11]

These facts as alleged by Mr. Huggins do not support his claim that the School District violated Title VII by creating a hostile work environment. Dr. Walker's alleged pejorative "boy" remark to Mr. Huggins falls into the category of isolated and offhand comments, and although inappropriate, cannot be considered to have altered the terms and conditions of Mr. Huggins' employment. The allegedly discriminatory conduct in this case was not "pervasive," nor was it sufficiently severe as to create a hostile environment that would affect the psychological stability of a reasonable employee with Mr. Huggins' profile.

To conclude that Dr. Walker's alleged comments do not provide the basis for a Title VII hostile work environment claim is not, of course, to condone the use of racially charged language in the workplace. However, Title VII is not a "general civility code," *Faragher*, 524 U.S. at 788, and a review of a range of prior discrimination cases from this Circuit (all involving decidedly uncivil remarks) illustrates that the conduct alleged in this case falls well short of the applicable legal threshold.[12]

---

[11]     Huggins Depo. at 63-65.

[12]     *See, e.g., Lassiter v. Children's Hosp.,* 2008 U.S. Dist. LEXIS 7579 (E.D. Pa. Jan. 31, 2008 (no hostile work environment where African American plaintiffs' alleged that they were routinely passed over for promotion and were subjected to greater scrutiny than Indian and white

## B.     *Retaliation*

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) he engaged in protected activity; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006).

As to the claims presented in Mr. Huggins' first Complaint, the record contains evidence that Mr. Huggins engaged in protected activity (i.e., reporting Dr. Walker's alleged comments to her supervisor, Dr. Poteat); and also that he was subjected to an adverse employment action (i.e., he was terminated, and he allegedly was not fully reinstated when his termination was reversed). However, there is insufficient evidence of causality for Mr. Huggins to succeed with his

---

peers); *Woodard v. DHB Die Casting*, 255 Fed. Appx. 608 (3d Cir. 2007) (no hostile work environment where African American plaintiff was asked if he planned to execute a drug deal during a bathroom break, where "you people" was used to refer to African Americans, and where graffiti depicting a burning cross and a Ku Klux Klan sign on a bathroom wall remained posted for three months after plaintiff reported it to his employer); *Boyer v. Johnson Matthey, Inc.*, 2005 U.S. Dist. LEXIS 171 at *53 (E.D. Pa., Jan. 7, 2005) (no hostile work environment where African American plaintiff was referred to as "boy" on as many as five occasions); *Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 608-611 (E.D. Pa. 2001) (no hostile work environment where African American plaintiff's supervisor called the black community a "baby factory," said that blacks are incapable of thinking analytically, and warned the plaintiff not to talk to white women); *Morgon v. Valenti Mid-Atlantic Mgmt.*, 2001 U.S. Dist. LEXIS 22420 (E.D. Pa., Dec. 14, 2001) (no hostile work environment where supervisor referred to the Jamaican plaintiff as a "nigger," and also said that she would prefer not to hire Jamaicans); *see also Al-Salam v. Bucks County Water & Sewer Auth.*, 1999 U.S. Dist. LEXIS 3609 at *5 (E.D. Pa., March 25, 1999) (*quoting Schwapp v. Town of Avon*, 118 F.3d 106, 110-111 (2d Cir. 1997) ("for racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racial comments")); *Drinkwater v. Union Carbide*, 904 F.2d 853, 863 (3d Cir. 1990) ("hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not [suffice]").

retaliation claim.

At first glance, it appears to be relevant that the investigation which led to Mr. Huggins'
termination was initiated within five weeks – and possibly fewer – of Mr. Huggins' conversation
with Dr. Poteat. Under certain circumstances, "temporal proximity [between a protected action
and an adverse employment action may be] sufficient to create an inference of causality to defeat
summary judgment." *Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 370 (3d Cir. 2008) (*citing
LeBoon v. Lancaster Jewish Cmty. Ctr..*, 503 F.3d 217, 232-233 (3d Cir. 2007)). On the other
hand, this inference is weakened here by the fact that the investigation was initiated when
students told Ms. Hannum and Ms. Berger that they were afraid of Mr. Huggins – and the record
contains no evidence that the students' complaint was anything but spontaneous and initiated by
them, as opposed to any of the adults at the school. There is no direct evidence of causality, and
it is not appropriate to infer causality on the singular basis of temporal proximity where the
adverse employment action was justified objectively as a response to events that were outside the
Defendants' control and where – as the Court will now discuss – there is no evidence that this
justification was fabricated.

Even if Mr. Huggins had shown causation, and thus set forth a *prima facie* case of
retaliation, he has failed to show that the legitimate reason for his termination that has been
offered by the School District is pretextual. Under the familiar *McDonnell Douglas* analysis,
after an employee has set forth a *prima facie* case, the burden of production shifts to the
defendant employer to articulate a legitimate, non-discriminatory rationale for the employment
action. Should the defendant satisfy its burden, the presumption of discriminatory action has
been rebutted, and the plaintiff must then demonstrate that the defendant's stated reasons are

pretextual.  *See Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793-94 (1973)).

Here, the School District clearly can point to a compelling, non-retaliatory reason for terminating Mr. Huggins: namely, that he was accused by students of having engaged in behavior that the School District determined to have violated sexual harassment provisions of the Public School Code.  The record contains no evidence that this proffered justification is pretextual.  Mr. Huggins cites the arbitrator's report as evidence that the School District's decision to terminate him was not based on just cause.  However, "to discredit the employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent."  *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-1109 (3d Cir. 1997).  There may be evidence in the record from which a factfinder could that the District erred (by whatever measure) in terminating Mr. Huggins, but there is no evidence suggesting that the ground on which it did so was pretextual.[13]  As a result,

---

[13]     Here, it is relevant that there is no evidence identifying Dr. Walker as a decision-maker with regard to Mr. Huggins' termination.  *See Foster v. New Castle Area Sch. Dist.*, 98 Fed. Appx. 85, 87-88 (3d Cir. 2004) (noting that "while discriminatory statements made by decision-makers with regard to the employment actions at issue are very strong evidence for a plaintiff, such statements made by non-decision-makers or individuals who played no part in the decision are inadequate to support an inference of discrimination").  In fact, Mr. Huggins was terminated by the Coatesville School Board (Affidavits of School Board Members, Exhibit L to the Motion for Summary Judgment as to the first Complaint).

Although Mr. Huggins identified comments by Dr. Walker which might serve as evidence of discriminatory animus, he conceded under oath that Dr. Walker was the only person who he believes discriminated against him based on his race (Huggins Depo. at 118, 280) (Q: "[Did] anybody else besides Dr. Walker [discriminate against you because of your race]?  Mr. Huggins: "No."  Q: "Did any school board member discriminate against you based on your race?"  Mr. Huggins: "No, I don't know any school board members.")  Even if Dr. Walker was involved in the decision to terminate Mr. Huggins or influenced that decision in some way – a

14

summary judgment will be granted as to the Title VII claim presented in Mr. Huggins' first Complaint.

Although the retaliation theory presented in Mr. Huggins' first Complaint does not survive a *McDonnell Douglas* analysis, the theory presented in his second Complaint has a somewhat stronger basis in the record. There is a *prima facie* case because the record provides evidence that Mr. Huggins engaged in a protected activity (the filing of the first Complaint); that he was subjected to adverse action (his transfer requests were denied; he was denied pay raises; and he received unwarranted poor performance reviews);[14] and that there was a causal connection between the protected activity and the adverse employment actions.

The evidence of causality is the statement that Mr. Huggins attributes to Mr. Como, via Mr. Quinones, that Mr. Huggins would only be transferred to Gordon as requested if he would drop his first case.[15] This statement also allows Mr. Huggins to satisfy, for present purposes, his *McDonnell Douglas* burden of production, since the statement is evidence from which the finder of fact could reasonably decide that the School District's stated reason for denying Mr. Huggins'

_____

possibility not supported by any evidence in the record – this would be insufficient to establish pretext, inasmuch as there were other decision-makers who acted independently on the basis of the proffered reason. *See, e.g., Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290-91 (4th Cir. 2004) ("an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision").

[14] Failure to rehire, promote, or transfer can constitute retaliation, even where an employee has no legal entitlement to be rehired, promoted or transferred. *See Suppan v. Dadonna*, 203 F.3d 228, 234 (3d Cir. 2000) (regarding First Amendment retaliation).

[15] Both Mr. Como's alleged statement to Mr. Quinones and Mr. Quinones' statement to Mr. Huggins are admissible as admissions of a party opponent. Statements made by a defendant's agents or servants within the scope of employment are not hearsay. Fed. R. Evid. 801(d)(2). There is sufficient basis in the record to invoke this Rule as to this alleged statement.

transfer back to Gordon (namely, that there were no available slots there) is merely a cover for what is actually an effort by a decision-maker to coerce him into dropping his case.[16]

## II.     *PHRA Claims Against the School District and Dr. Walker*

In his first Complaint, Mr. Huggins presents a PHRA claim against the School District and Dr. Walker; in the second, he presents a PHRA claim against the School District.  These claims mirror Mr. Huggins' Title VII claims.  Because the PHRA is interpreted in accord with its federal counterparts, *see Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375 (3d Cir. 2002), the Court's analysis in Section I, *supra*, is equally applicable here.  *See, e.g., Weston v. Pennsylvania Dep't of Corrections*, 251 F.3d 420, 426 n.3 (3d Cir. 2001) (*citing Smith v. Pathmark Stores, Inc.*, 1998 U.S. Dist. LEXIS 8631 (E.D. Pa. June 11, 1998); *Clark v. Pennsylvania*, 885 F. Supp. 694, 714 (E.D. Pa. 1995)).[17]

As a result, summary judgment will be granted as to the PRHA claim presented in Mr. Huggins' first Complaint.  The resolution of the motion as to the PHRA claim from the second Complaint is discussed in Section III, *infra*.

---

[16]     In Section III, *infra*, the Court will discuss whether Mr. Huggins exhausted all of his administrative remedies with regard to this Title VII claim.

[17]     The sole significant difference is that Mr. Huggins' first Complaint only presents a Title VII claim against the School District, but presents PHRA claims against the District and Dr. Walker.  However, for the same reasons that the record does not support a hostile work environment or retaliation claim against the District under the theory presented in the first Complaint, the record does not support any such claims against Dr. Walker.

**III.** *Title VII and PHRA: Exhaustion of Administrative Remedies*

As discussed above, the factual record does not support Mr. Huggins' hostile work environment claims or the retaliation claim set forth in the first Complaint, but a finder of fact could rationally determine – based on the statement of Mr. Como, via Mr. Quinones – that the School District's refusal to transfer Mr. Huggins back to Gordon was retaliatory. However, Mr. Huggins never filed an administrative complaint with regard to the claims set forth in his second Complaint, and therefore failed to exhaust his administrative remedies before filing suit.

A plaintiff bringing an employment discrimination claim under Title VII must comply with procedural requirements set forth in 42 U.S.C. § 2000e-5. Before filing suit, a plaintiff must exhaust his administrative remedies by filing a timely discrimination charge with the federal Equal Employment Opportunity Commission ("EEOC"). *Id.* §§ 2000e-5(b), (e)(1), (f)(1). The EEOC will then investigate the charge, and the plaintiff must wait until the EEOC issues a right-to-sue letter before he can initiate a private action. *Burgh v. Borough Council*, 251 F.3d 465, 470 (3d Cir. 2001). The ensuing suit is limited to claims within the scope of the initial administrative charge. *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996).[18] "The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." *Id.*

A communication with the EEOC in or reduced to writing, including an intake questionnaire, may constitute a charge if it is "of a kind that would convince a reasonable person that the grievant has manifested an intent to activate the Act's machinery." *Bihler v. Singer Co.,*

---

[18] Otherwise, the charging party could greatly expand an investigation simply by alleging new and different facts when he was contacted by the Commission following his charge. *See Hicks v. ABT Associates, Inc.*, 572 F.2d 960, 967 (3d Cir. 1978).

710 F.2d 96, 99 (3d Cir. 1983). A communication with the EEOC will not constitute a charge if the EEOC advises a grievant that he must provide further information and then get back in touch with the agency to complete a formal charge and commence an investigation. *See Michaelson v. Exxon Research and Engineering Co.,* 808 F.2d 1005, 1010 (3d Cir. 1987).

In this case, as to the Title VII and PHRC claims presented in the second Complaint, Mr. Huggins does not dispute that he failed to file an administrative complaint with either the EEOC or its state equivalent, the Pennsylvania Human Relations Commission ("PHRC"). Instead, he argues that because he filed a claim with the PHRC before filing the *first* Complaint (PHRC Case No. 200504470 and EEOC No. 17F200660933), and placed the PHRC on notice of later acts of retaliation via letter, it would have been legally futile for him to file an additional claim regarding the new incidents alleged in the second Complaint – this, despite the fact that the first PHRC case was officially closed as soon as the first Complaint was filed.

There is no evidence in the record to suggest that Mr. Huggins would have been unable to exhaust his administrative remedies with regard to the allegations in the second Complaint.[19] Indeed, in a letter dated April 13, 2009, the PHRC actually informed Mr. Huggins that while he had missed the 80-day deadline for filing a claim with the PHRC, he would still be able to file with the EEOC, which has a 300-day deadline. By that point, however, Mr. Huggins had already filed his second Complaint.

Given that Mr. Huggins failed to exhaust his administrative remedies regarding the Title VII and PHRA claims presented in his second Complaint before filing that Complaint, summary

---

[19] "In order to invoke the futility exception to exhaustion, a party must 'provide a clear and positive showing' of futility before the District Court." *Wilson v. MVM, Inc.*, 475 F.3d 166, 176 (3d Cir. 2007) (*quoting D'Amico v. CBS Corp.*, 297 F.3d 287, 293 (3d Cir. 2002)).

judgment will be granted as to each of these claims.

### IV.    *Section 1983 Claims Against Dr. Walker, Mr. Como and Mr. Quinones*

In the first Complaint, Mr. Huggins alleges a § 1983 violation by Dr. Walker.  In the

second Complaint, he alleges § 1983 violations by Mr. Como and Mr. Quinones.  Each of these

claims suffers from the same deficiency: the factual record does not show that Mr. Huggins was

treated differently than others who were similarly situated.

#### A.    *Dr. Walker*

To prevail on a  § 1983 claim for a denial of equal protection, a plaintiff must at

minimum show that the treatment he received was different from that received by others who

were similarly situated.  *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)

(internal quotations and citations omitted).  It is not enough for a plaintiff to allege generally that

a defendant's conduct deprived him of his civil rights in violation of the Equal Protection Clause.

*Oberle v. City of Duquesne,* 2008 U.S. Dist. LEXIS 32076 at *11-12 (W.D. Pa. 2008) (*citing*

*Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) ("general accusations and the

invocation of the Equal Protection Clause are not enough" to prevail on a § 1983 claim).

In this case, there is no evidence in the record that Dr. Walker treated Mr. Huggins

differently from other similarly-situated employees.[20]  There is, of course, evidence that Dr.

---

[20]    Mr. Huggins' first Complaint does allege disparate treatment, but it does not
attribute this to Dr. Walker.  Paragraph 40 alleges that after his termination was reversed, Mr.
Huggins was "reinstated back to work at a different school [i.e., not Gordon, where Dr. Walker
was principal] ... and was given more work than his white male co-workers."  In Mr. Huggins'
deposition, he stated that work assignments at his new school were handled by Mr. Quinones and
only Mr. Quinones (Huggins Depo. at 278-279).

Walker made two racially insensitive remarks to Mr. Huggins, but this fact alone is not enough to show disparate treatment. In *Pollack v. City of Phila.*, 2007 U.S. Dist. LEXIS 11624 (E.D.Pa. 2007), the Court evaluated a § 1983 claim brought by a former police officer who claimed that his supervisor subjected him to "continual" racial abuse. The Court found that the plaintiff had failed to state a claim because "although plaintiff has alleged that he was subject to harassment on the basis of his race, he has failed to allege that he was treated in any way differently than any other individuals, a requirement for pleading an equal protection claim." *Id.* at *11-12 (*citing Keefer v. Durkos*, 371 F. Supp. 2d 686, 696-97 (W.D. Pa. 2005)).[21]

This case is analogous. Dr. Walker's comments to Mr. Huggins do not provide the basis for a § 1983 claim, and the record contains no other evidence that she subjected Mr. Huggins to disparate treatment.[22] In light of this, the Court will grant summary judgment as to the § 1983 claim set forth in the first Complaint, and will not reach the issue of qualified immunity.

---

[21] *See also Nichelson v. Redwine,* 2000 U.S. Dist. LEXIS 15654 (E.D. Pa. October 26, 2000) ("without averments of facts alleging a similarly situated person, how that person was treated differently, and how the different treatment intentionally lacked a rational basis, a complaint states no violation of equal protection") (*citing Artway v. Attorney General of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996)); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990) (although "comments suggesting that the employer may have considered impermissible factors are clearly relevant to a disparate treatment claim ... 'stray' remarks are insufficient to establish discrimination").

[22] To the extent that Mr. Huggins might be presenting a hostile work environment claim under § 1983, the Court's analysis of that issue with regard to Title VII is applicable here. *See, e.g., McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 567 (7th Cir. 2000) ("because § 1983 claims generally follow the contours of Title VII claims, we will apply the same hostile environment that is applied in Title VII cases").

## B.    *Mr. Como and Mr. Quinones*

The basis of Mr. Huggins' claims against Mr. Como and Mr. Quinones in the second Complaint is that they retaliated against him after he filed the first Complaint.  Most notably, he claims that they refused to transfer him back to Gordon, and says that Mr. Como conditioned his potential transfer back to Gordon on his dropping the first Complaint.  Mr. Huggins also claims that he was denied pay increases after his termination was reversed and had been reinstated.

However, the record again provides no evidence of disparate treatment because it contains no evidence that Mr. Huggins was treated differently than similarly-situated employees.  When asked during his deposition whether he knew of any other custodian who had requested or received or been denied a transfer, Mr. Huggins said that he did not (Huggins Depo. at 221-222).  And when asked whether he knew if any of his co-workers had received pay raises, he gave the same answer (Huggins Depo. at 263).

Mr. Huggins did submit an affidavit in which he asserted that "on or about April 12, 2007, I was working with Jerry and Amos (white males) and was given more work assignments than my co-workers."[23]  However, the fact that Mr. Huggins may have been assigned more work than two white co-workers on a single occasion cannot – as a matter of logic or law – provide the basis for a Section 1983 disparate treatment claim.[24]  Mr. Huggins' vague claims of having been

---

[23]    Huggins Affidavit of June 29, 2007, attached as Exhibit I to Plaintiff's Response in Opposition to the Motion for Summary Judgment as to the second Complaint.

[24]    *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("harder work assignments do not constitute an adverse employment action"); *Young v. Rogers & Wells LLP*, 2002 U.S. Dist. LEXIS 21541 (S.D.N.Y. Nov. 06, 2002) ("giving an employee more work ... is not an adverse employment action"); *cf. Avillan v. Potter*, 2006 U.S. Dist. LEXIS 80062 (S.D.N.Y. Nov. 1, 2006) (plaintiff demonstrated adverse employment action where he was given more work than other employees "quite often").

subjected to greater scrutiny than co-workers are similarly insufficient in this context.[25]

The Court will grant summary judgment as to the § 1983 claim set forth in the second Complaint, and will not reach the issue of qualified immunity.

---

[25]     Mr. Huggins asserts that on one occasion, Mr. Quinones took pictures of projects that he had failed to complete.  "It is well-settled that being closely supervised or 'watched' [by a supervisor] does not constitute an adverse employment action ... ."  *Green v. Port Auth. of N.Y. & N.J.,* 2009 U.S. Dist. LEXIS 100871 (D.N.J. October 29, 2009) *(citing McKinnon v. Gonzales,* 642 F. Supp. 2d 410 (D.N.J. July 24, 2009)).

The Defendants' Motions for Summary Judgment are granted in their entirety. The School District and Dr. Walker are entitled to summary judgment as to the Title VII and PHRA claims presented in the first Complaint because the evidence in the record does not support a hostile work environment theory, and there is no evidence that the School District's proffered reason for terminating Mr. Huggins was pretextual. Dr. Walker is entitled to summary judgment as to the Section 1983 claim in that case because there is no evidence of disparate treatment.

The School District is entitled to summary judgment as to the Title VII and PHRA claims presented in the second Complaint because Mr. Huggins failed to exhaust his administrative remedies before filing suit. Messrs. Como and Quinones are entitled to summary judgment as to the Section 1983 claim in that case because there is no evidence of disparate treatment.

An order to this effect follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE